WILLIAM RODES, Plaintiff-Appellee, *v.* PRESTON CORPORATION *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 76-1339, 76-1599 cons.

Opinion filed June 12, 1978.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and William J. Holloway, of counsel), for appellants.

James E. Kellogg, of Chicago, for appellee.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Plaintiff William Rodes, a real estate salesman, sued defendants, Preston Corporation, his former employer, and the corporation's president, Robert Pristo, for a commission. After a bench trial in the circuit court of Cook County, the court entered judgment in favor of plaintiff and against both defendants for the sum of $78,750, plus statutory interest from November 20, 1971, to the date of judgment, July 29, 1976. Defendants have appealed and argue that (1) plaintiff failed to present sufficient evidence to sustain the judgment because (a) the prospective purchaser he procured never made an offer to purchase on the terms set by the seller, (b) the prospective purchaser was not proved to be an able buyer, and (c) the prospective purchaser was not proved to be a ready and willing buyer; (2) there was no evidence to prove that the prospective purchaser's offer was used to influence the ultimate purchaser's price; (3) the judgment entered personally against defendant Pristo is erroneous; and (4) the award of statutory interest is erroneous.

The real estate involved in this suit consisted of three contiguous parcels improved with three apartment buildings and a swimming pool, located in Forest Park, in Cook County, Illinois. The buildings were each less than five years old in 1971 and contained a total of 213 apartments.

Plaintiff William Rodes testified that in 1971 he had been issued a real estate salesman's license by the State of Illinois. In April of 1971 plaintiff answered an advertisement placed by defendant Preston Corporation, offering to employ real estate salesmen. He met with Joseph Suster, vice-president of Preston Corporation, on May 10 and accepted employment on that date. There was no written memorandum of the terms of

employment executed by plaintiff and defendant, but orally plaintiff was informed by Suster that plaintiff would be paid on a commission basis and various rates of commission were specified for different transactions which plaintiff might produce. Pertinent to this litigation, plaintiff testified that he was told by Suster that he would receive 2¼% commission on any straight sale of any of the properties that were owned by Preston Corporation or Pristo. Plaintiff was introduced to the staff of the corporation, including salesman Allen Schimke, as an employee engaged to sell the Forest Park properties. He testified that he devoted his full time working for the corporation until he was discharged on November 29, 1971.

Plaintiff testified that Suster told him he was the only person in the office selling the Forest Park properties. Plaintiff understood that he had an "exclusive salesman listing" on those properties. He physically showed the properties to prospects about 25 times. The listing price of the properties when plaintiff began his employment was $4,425,000.

On July 17, 1971, plaintiff received an offer to purchase the properties for $3,150,000, accompanied by a check for $10,000. Plaintiff testified that Pristo turned the offer down and stated that he would accept $3,300,000. Plaintiff returned to the offeror, one Tepperman, who rejected the higher price. Plaintiff testified that Pristo never stated another price to him after the $3,300,000 was mentioned in connection with this offer.

On October 24, 1971, plaintiff met one Schlesinger and showed him the property. Plaintiff testified that Schlesinger made a "tentative" offer of $3,400,000, subject to verification of expenses, taxes and income. Plaintiff told Pristo that a trade of a parcel of vacant land was involved and that the offer was $3,400,000 and, according to plaintiff, Pristo stated that he thought a deal could be made for that price.

Plaintiff, Pristo, Suster, Schlesinger and one Spector then met at a Ramada Inn. Plaintiff testified that the following occurred: Schlesinger examined operating figures on the buildings and stated that, based on the figures, he would offer $3,371,000 and give the corporation $42,132 to manage the property the first year. He was ready to deposit $100,000 in escrow to begin the transaction. The price he offered included a trade of land to the seller which a third party would buy from the seller for $1,150,000. Schlesinger also stated he wanted to verify the profit margin, the vacancy rate and the tax bill. Pristo said he needed more money, but that he would think about it. The meeting concluded. Suster told plaintiff that he was surprised Pristo had turned the deal down. Back at the office, Pristo told plaintiff to get an extra $50,000 and a letter of intent from Schlesinger.

A letter, dated November 8, 1971, from a law firm representing one Ornoff was received by Preston Corporation shortly thereafter. The letter

was introduced into evidence and plaintiff testified that the letter contained an offer by Ornoff to buy Schlesinger's vacant land from Pristo for $1,500,000 above the existing mortgages on the properties. Pristo was given the letter and told plaintiff that the offer was still about $100,000 short. Plaintiff further testified that Pristo was asked to give a second mortgage to Schlesinger of $100,000 to make up the difference, which, according to plaintiff, would have made the offer the sum of $3,425,000. Plaintiff asked Pristo why he kept raising the price and Pristo replied, "To get more money."

Plaintiff testified that a second meeting took place at the Ramada Inn among Schlesinger, Suster and himself. Suster told Schlesinger that Pristo wanted $3,500,000. Schlesinger said it depended on the terms and he wanted to see the books on the properties before he could pay that price. When plaintiff and Suster left, Suster told plaintiff that he thought it was a good offer. Pristo agreed to meet with Schlesinger on Saturday, November 20, at 11 o'clock.

On November 20, according to plaintiff's testimony, plaintiff confronted Pristo at 10:45 and told him that Schlesinger was a buyer ready, willing and able to complete the transaction, and that plaintiff expected his commission. Pristo asked if plaintiff would take $25,000 if Schlesinger went to $3,500,000 and plaintiff said, "No." Pristo said he felt that plaintiff should be compensated for his work. Then Schlesinger arrived, went into Pristo's office and examined the books, leases and other records. Pristo then said, "I don't even think I can sell this property for cash because of my tax position. I'd rather sell it on a contract." Schlesinger said he would be interested on that basis and that he would get back on Monday.

Plaintiff testified that Schlesinger did call him on Monday and made the following offer, which plaintiff relayed to Pristo: $450,000 cash; $450,000 after 12 months; Schlesinger would take over the existing mortgages; and plaintiff himself would provide a $50,000 second mortgage if Pristo wanted it. Plaintiff testified that this totaled an offer of $3,500,000. Pristo then told plaintiff that he had decided to sell to Campbell and Gehrs for "around three and a half million." Plaintiff told Pristo he didn't care who bought the property, he wanted his commission and Pristo said he would be compensated.

Plaintiff testified that on the date he was discharged Suster told him he thought plaintiff should be compensated. Two days later plaintiff called Suster and asked that his commission check be sent to his home address and Suster again indicated that plaintiff should be compensated. Plaintiff testified that he called three to five more times on later dates and each time Suster indicated plaintiff would be paid.

On or about January 12, 1972, plaintiff met with Pristo by appointment at the corporate offices and told Pristo that he had heard a deal had been made with Campbell and Gehrs and that he wanted his commission. Pristo refused to pay plaintiff anything.

During his employment, plaintiff told Campbell and Pristo that he should be part of their negotiations, but Pristo said he would handle the deal completely with Campbell and plaintiff should not discuss the project further with him. Plaintiff testified that Campbell had seen the financial statements which plaintiff had prepared on the properties. Plaintiff had never received any compensation on the sale.

On cross-examination, plaintiff testified that a "straight sale" meant the property was sold without a trade, whether a contract sale, cash sale or on installments. His fellow employee Schimke was compensated only on a commission basis. Plaintiff was aware that Campbell or Gehrs had done business with the corporation before he was hired. He was told when he began working that the only negotiations in progress on the properties was a possible land trade being investigated by salesman Schimke. Plaintiff was aware that Pristo owned or controlled all of the properties concerned. His commission was based only on results produced. At one time plaintiff had told Pristo that he would accept $25,000 as his commission if the property was sold to Schlesinger-Ornoff, but he denied that this was to encourage Pristo to sell.

Plaintiff denied that he had no right to a commission on sales that would be completed after his employment terminated. However, his affidavit in opposition to defendants' motion for summary judgment states that the agreement was that plaintiff would receive a commission if any of the properties were sold during his employment, and makes no mention of a right to a commission should the sale be completed after his termination. Plaintiff admitted that the asking price on the property description sheets was never reduced below $3,655,000.

The terms he understood the property could be sold for was "cash to the mortgage," which meant the sales price must equal the sum of the existing mortgages plus cash.

Plaintiff believed the letter from Ornoff's attorney was consistent with the deal described by Schlesinger at the first meeting at the Ramada Inn. Plaintiff did not know Ornoff and had never met him. At his deposition he had agreed that Schlesinger wanted a warranty that the properties were fully assessed.

Regarding the $50,000 second mortgage plaintiff would have put into the deal with Schlesinger, plaintiff first testified that it was not to be part of his commission, then that it was part of his compensation. He offered to cut the amount of his commission due from his employer in order to put

the deal through, plaintiff admitted. He also admitted that at his deposition he stated that. Pristo never told him the property was committed to Campbell.

On redirect examination, plaintiff testified that he had told Schlesinger at their first meeting that the asking price of the properties was $3,655,000.

Plaintiff called Clifton O'Brien, an accountant for Preston Management Corporation in 1971, who testified that plaintiff was introduced to him as a salesman for the corporation. He witnessed a conversation between plaintiff and Pristo, in which plaintiff asked if Pristo would take a certain dollar figure, which the witness could not remember, for the property and Pristo disgustedly said, "I can't" and walked away. The Forest Park properties were sold in December of 1971.

Plaintiff called Robert Campbell, who testified that he participated, as general partner in two limited partnerships, in the purchase of the property on December 31, 1971. He had first looked at the property in the winter of 1970-1971 and at that time asked Pristo what the price was, but at trial he could not remember if one was stated. He didn't know if he had seen plaintiff's "workups" (financial statements) on the property and he couldn't remember whether he had ever seen financial statements on the property before he bought it. He didn't know who plaintiff was at the time of plaintiff's employment. He had agreed to purchase the property some time before the closing on December 31, but he couldn't remember exactly when.

Plaintiff then called, as an adverse witness, Joseph Suster, who was in 1971 and at the time of the trial an officer of defendant Preston Corporation. Suster testified that he had advertised the subject properties for sale five or six weeks before plaintiff was employed. It was agreed that plaintiff "would have been entitled to a two and a quarter percent on any cash sale he had consummated." Before plaintiff was hired, responses to the advertisement about the property were directed to Schimke. Suster himself showed some persons the property and quoted a price of about $4,000,000. The witness denied telling plaintiff that no one would compete with plaintiff in selling the property, and denied telling Schimke that plaintiff would handle the property until a later date. The witness identified exhibits, described by plaintiff in his testimony as being operating statements he prepared on the properties while employed. Suster stated that the documents did not appear to be significantly different from those prepared by Preston Corporation before plaintiff began work.

Though he admitted having lunch with plaintiff "frequently" during the time plaintiff was employed, Suster testified that he didn't know if plaintiff did anything to sell the properties and that plaintiff "never received an offer on the properties that he presented to me." The witness

stated that the July presentation by Tepperman was not an "offer" because it was contingent on many things; it was merely "showing an interest in the properties" at $3,150,000, which Suster told plaintiff was too low. The witness never heard Pristo tell plaintiff that $3,300,000 was an acceptable price; the only figure he heard under four million dollars was $3,655,000. Suster denied that plaintiff had ever complained that the price was too high.

Suster met Schlesinger who "showed an interest" at $3,100,000. They met again in early November, but Schlesinger only raised the price he was willing to pay by $50,000, which was still too low. Suster stated he was not acquainted with Robert Campbell, did not know his relationship, if any, to Preston Corporation, and was never told by Pristo that Campbell was interested in the properties. He denied having any knowledge about the eventual sale of the properties at all.

Suster couldn't recall if plaintiff ever demanded to be compensated, but he denied ever telling plaintiff that he thought plaintiff should be compensated or telling Pristo plaintiff should be compensated. He admitted that at his deposition he had stated that plaintiff suggested a sales price, and that "normally" plaintiff would be sent out to the properties with prospects.

Defendant Robert Pristo was called as an adverse witness by plaintiff and testified that in 1971 he was president and controlling stockholder of Preston Corporation. He testified that Preston Corporation had a listing to sell the subject properties, but did not own or control them. Pristo testified that he in fact controlled the price on the properties.

Before May of 1971, efforts were made to sell the properties through newspaper advertisements. The asking price was in excess of $4,000,000, which he considered to be a realistic market price. But he admitted that he had stated in his deposition that he really didn't want to sell the property then and so had set the price at an "astronomical price." Suster hired plaintiff and Schimke to sell the property; the witness did not negotiate the terms of plaintiff's employment.

Pristo testified that plaintiff was initially engaged to sell other property, but around July of 1971 it was decided that it would be prudent to sell the Forest Park properties. According to the witness, plaintiff did not ask if other persons in the office would also be trying to sell the properties. On one or two occasions he was informed by Suster that plaintiff had developed some interest in the properties, but these leads were immaterial.

Operating statements on the subject parcels were prepared every four to eight weeks, always with the witness's approval. Pristo did not personally show the subject property to Campbell, but he had been informed by the rental agent that Campbell had been out to see the

property several times in the summer of 1971. The witness knew that Gehrs had looked at the property during the winter of 1970-1971. Suster "may have" told the witness that plaintiff thought the asking price was too high.

An exhibit introduced and identified by plaintiff as the "Tepperman offer" was recognized by the witness, who denied that it was an "offer." Pristo testified that this document expressed a willingness to pay $2,780,000, but at his deposition he did not quarrel with counsel's characterization of the offer as $3,150,000. The witness denied talking to plaintiff about the Tepperman deal at all, specifically denying that he told plaintiff to try to raise Tepperman. Pristo took no action on it except to return the check for $10,000. Plaintiff did ask him to lower the price, but he did not consider it, and did not state a lower acceptable price to plaintiff immediately following receipt of the Tepperman letter. He did state to plaintiff on September 8 that the asking price was reduced to $3,655,000. He admitted that at his deposition he had stated he was sure that the price had come down to $3,500,000. The property was sold at a price of slightly more than $3,500,000.

There were three or four "inquiries" by Bob Campbell between July and September of 1971, but the witness couldn't recall specific amounts or the lowest figure discussed. He discussed the Campbell deal with neither plaintiff nor Suster and did not consider it his duty to keep plaintiff informed of the status of his dealing with Campbell, or other salesmen's offers or inquiries about the property.

Pristo testified that he met Schlesinger in late October at the Ramada Inn, but he did not recall Schlesinger offering to put $100,000 into escrow at the meeting. He did recall that Schlesinger offered to put something into escrow "if we could come to a meeting of the minds." Schlesinger proposed two or three "arrangements," one of which was a three-way trade which the witness characterized as a "three way tax sham," and another of which involved Preston Corporation continuing to operate or manage the property on a net cash flow arrangement to him. Schlesinger was building to a certain figure, starting off with "something like a three million one hundred and some thousand dollar figure" coupled to conditions such as a second mortgage from the seller and cash flow over a certain figure. Pristo testified he told Schlesinger he wasn't interested in these arrangements, especially the three-way trade. Schlesinger also expressed what the witness considered an extraordinary condition, that his interest was subject to proof of a fully assessed tax bill.

The witness testified that he did not ask plaintiff to firm up the Schlesinger deal, but plaintiff did procure the letter from the law firm representing Ornoff. Pristo understood the letter to be an "inquiry" at $3,120,000, not $3,329,000, and did not consider it to be an offer because he

had never met Ornoff and "I would not conclude that someone I had never met would offer me $1,150,000 over figures that he doesn't even talk about." Pristo explained the $209,000 difference between his understanding of the amount suggested in the Ornoff letter and the amount testified to by plaintiff in this manner: the parcel which Pristo was buying by installments from the beneficial owner had a contract balance of $819,000 to be paid before Pristo was entitled to a deed. However, the beneficial owner owed a balance of some $616,000 on the mortgage on the property. Since the letter suggested $1,150,000 over the existing mortgage, the witness understood the offer to be in the vicinity of $3,120,000.

Pristo denied that plaintiff had ever approached him in the presence of Campbell, and denied that plaintiff had ever accused him of using Schlesinger for leverage to raise Campbell's price. Pristo met Schlesinger again at the corporation office on November 20. Plaintiff and the witness had a conversation before Schlesinger arrived, in which plaintiff tried to convince him to deal with Schlesinger and offered to cut his commission to $25,000 if a deal could be worked out. The witness testified he told plaintiff that cutting a commission was not the way to make a deal work. The witness testified that plaintiff was not present at the meeting between Schlesinger and himself. Schlesinger came up to a dollar figure around $3,300,000. Pristo didn't recall ever telling Schlesinger or plaintiff that he had already agreed to sell the property to someone else, and he didn't recall a conversation with plaintiff relaying a $3,450,000 offer from Schlesinger in which plaintiff would take a note from the buyer for $50,000 of his commission.

According to Pristo, plaintiff never stated a demand for compensation no matter who purchased the property. He told Suster to "release" plaintiff because there was apparently little they could do for each other. Plaintiff did come to the office and see Pristo in January 1972, and stated that he felt he should be compensated, and Pristo told him he didn't see anything that plaintiff had done which earned compensation. Suster never told Pristo that plaintiff should be compensated. There was no value in plaintiff's dealings with Schlesinger because Schlesinger's negotiations were never communicated to Campbell. On November 20, 1971, he had not entered into a contract to sell to Campbell; the contract was entered into and the deal was closed on December 31, 1971. The selling price was $3,500,000 plus "fringe benefits." Pristo admitted, however, that the closing statement revealed a selling price of $3,345,000 and the title insurance policies totaled $3,381,000. The title insurance was ordered on the properties on December 22, 1971, at the corporation's direction.

Fringe benefits which were received by the sellers on December 31 included the use of over $200,000 for the life of the contract; reimbursement for prepayment penalties under the mortgage

agreements, which saved $56,000 according to the witness; a management fee of $18,977 to Preston Corporation for one year; and income from investment of the money escrowed to pay the 1971 taxes. Pristo admitted that Schlesinger's negotiations had included some discussion of a management fee to the corporation. Pristo computed that the sum of the Campbell sale price plus all fringe benefits equalled $3,675,754.44.

Plaintiff also called Allen Schimke, who testified that he was employed by Preston Corporation as a real estate salesman from March to November or October of 1971. He testified that part of his duties was to sell the subject property if he could. All responses to advertisements about the property went to Suster's desk and Suster never referred any of these responses to Schimke.

On cross-examination, Schimke stated that after plaintiff started work he (Schimke) only tried to find trade prospects for the property. Schimke's understanding of his own rights to compensation was that, even after plaintiff started, he would himself get a commission if he sold the property. He thought he was aware that Pristo was trying to sell to Campbell and he thought Suster was trying to sell after plaintiff was hired. The operating statements allegedly prepared by plaintiff on the property were not significantly different from those prepared before plaintiff was hired.

Schlesinger did not testify.

The defense read admissions made by plaintiff at his deposition, including that plaintiff agreed to drop his commission to $25,000 to close a deal with Schlesinger; that Schlesinger offered the three-way land trade at the Ramada Inn meeting with Pristo and that such a transaction would require the agreement of all three parties; that the terms of sale of the property were "cash to the mortgage"; that he did not obtain Gehrs or Campbell; that his agreement was that if any of the properties were sold during his employment, he would receive a commission of 2¾% of the selling price; and that he was to be paid strictly on results produced and strictly on a commission basis.

Pristo then testified on his own behalf and for defendant Preston Corporation. He gave an oral open listing of the property to Preston Corporation, meaning that any salesperson employed there could work on the sale without any responsibility to any other salesperson. No commitment had been made to Campbell until the day of the sale itself, December 31, 1971. On the morning of December 30 negotiations started and the necessary papers and documents were drawn in a bargaining session which included Pristo, his secretary and his lawyer; and Gehrs, Campbell, two lawyers and an accountant. They worked straight through until 2 p.m. on December 31.

■■■ The law with reference to a broker's right to a commission is well settled:

"Where a broker is employed to sell property by the owner, if he produces a purchaser within the time limited by his authority who is ready, willing and able to purchase the property upon the terms proposed by the seller he is entitled to his commissions, even though the seller refuses to perform the contract on his part. In such case, however, it is necessary for the broker to prove the readiness, willingness and ability of the purchaser to take the property on the terms proposed." (*Fox v. Ryan* (1909), 240 Ill. 391, 396, 88 N.E. 974, 976.) ·

A prospective purchaser of realty will be considered able to buy if he has sufficient funds on hand or if he is able to command the necessary funds with which to complete the purchase within the time allowed by the offer. (*Garrett v. Babb* (1975), 24 Ill. App. 3d 941, 945, 322 N.E.2d 217, 220.) Applying the law to the facts of this case, we must conclude that plaintiff did not prove he was entitled to a commission.

Defendants acknowledge that the findings of the trier of fact will not be disturbed on appeal unless they are against the manifest weight of the evidence. They argue, however, that plaintiff produced no evidence to support essential elements of his cause of action and the judgment must therefore be reversed. (*La Salle National Bank v. American Insurance Co.* (1973), 14 Ill. App. 3d 1027, 303 N.E.2d 770.) We agree.

■■■ First, the owner's price was not met by any prospective purchaser produced by plaintiff. Plaintiff testified and admitted during discovery that the asking price or listing price on the property was in excess of $4,000,000 until September, when it was reduced to $3,655,000. Plaintiff himself communicated the latter price to Schlesinger. There was no testimony that either Tepperman, Schlesinger or Ornoff ever offered to pay as much as $3,655,000. Plaintiff did testify that Pristo had agreed to accept $3,300,000 from Tepperman in July, but Tepperman did not accept this counteroffer. If it was not accepted, it was revocable at any time. (*Threlkeld v. Inglett* (1919), 289 Ill. 90, 124 N.E. 368.) Since no prospective buyer procured by plaintiff ever met the asking price, or even the eventual sales price as established by Pristo's uncontradicted testimony, plaintiff earned no commission.

Second, none of the prospective purchasers agreed to purchase on the terms set by the seller. Plaintiff testified that the terms were cash or cash to the mortgage, meaning the sales price offered must equal the sum of the outstanding mortgages plus cash. The Tepperman and Ornoff proposals, admitted into evidence and made part of the record on appeal, are both made expressly contingent upon several factors, not the least of which were clauses calling for the parties later executing a definitive contract. A party making such an offer will not be bound until the contingency is satisfied by the actual preparation and signing of such a document. (*Terracom Development Group, Inc. v. Coleman Cable & Wire Co.*

(1977), 50 Ill. App. 3d 739, 365 N.E.2d 1028; *Casati v. Aero Marine Management Co.* (1976), 43 Ill. App. 3d 1, 356 N.E.2d 826.) Schlesinger's offers, all of which were oral, all contained contingencies according to plaintiff's testimony, such as second mortgage financing, verification of tax bills, and a three-way trade of land. The seller was not obliged to accept terms varying from those set in his offer of the property for sale. *Spilky v. McDonald* (1968), 94 Ill. App. 2d 411, 236 N.E.2d 907; *Joseph A. Thorsen Co. v. Husted* (1977), 50 Ill. App. 3d 1043, 366 N.E.2d 132.

Third, plaintiff produced no evidence that the prospective purchasers were able to buy. The Tepperman offer reveals that Tepperman signed it, "not personally, but as agent for all of the beneficiaries of a land trust to be formed or a corporation to be organized." Plaintiff produced no evidence that Ornoff was an able buyer. And Schlesinger was not shown to have been an able buyer by any evidence introduced at trial. Schlesinger did not testify. (Compare *Wolfenberger v. Madison* (1976), 43 Ill. App. 3d 813, 357 N.E.2d 656.) Plaintiff argues that Schlesinger offered to put $100,000 into escrow, and that a person who has such funds must qualify as an able and willing purchaser. But an offer to place money in escrow is substantially different from the act of producing those funds, and plaintiff failed to sustain his burden of proving that Schlesinger was an able buyer.

Plaintiff also claimed a right to a commission on the sale to Campbell-Gehrs. He testified that his understanding of the terms of his employment was that he had been given an exclusive salesman listing on the properties, meaning that he would receive a commission if the property was sold during the course of his employment no matter who was the negotiating salesperson. But against this testimony by plaintiff, his witness Schimke testified that he himself believed he would receive the commission if he sold the property. This tends to weaken plaintiff's testimony concerning the breadth of his authority. Plaintiff also admitted that he offered to cut his commission if the sale could have been made to Schlesinger rather than Campbell-Gehrs. It is unlikely that plaintiff would have been so eager to sell to Schlesinger and not to Campbell-Gehrs if he believed he was going to receive a commission no matter who purchased the property.

■■ Plaintiff was terminated on November 29. The uncontradicted testimony of Pristo was that the property was sold on December 31. The only evidence tending to show that an earlier contract of sale had been entered into was Campbell's testimony that he had agreed to purchase the property some time before December 31, but he couldn't remember when, and the established fact that defendant corporation had ordered title insurance on the property on December 22. Neither of these facts establishes that a contract had been entered into during the time of

plaintiff's employment. In evidence was the employment application signed by plaintiff, which declared that he understood he could be terminated without notice or cause. Plaintiff also admitted on cross-examination that he was aware that the buyers had done business with defendants before his employment began, and that he had not procured Campbell or Gehrs. We concluded that even if plaintiff had been given an "exclusive salesman listing" as he testified, he did not prove himself entitled to a commission on the sale to Campbell-Gehrs, because the sale took place after his employment had been properly terminated, and was made to a buyer whom he did not procure and who had been negotiating with the seller even before plaintiff's employment commenced. We find *Western Pride Builders, Inc. v. Zicha* (1974), 23 Ill. App. 3d 770, 320 N.E.2d 181, distinguishable because there the broker produced an offer from the eventual buyer and did not have his agency terminated before the sale was completed.

■■ Plaintiff also presented at trial the theory that through his efforts in procuring Schlesinger's offers and in restructuring the operating statements on the buildings defendants were either able to increase the price received from Campbell-Gehrs or would not have sold at all but for his marketing expertise. While under certain circumstances a broker may recover in *quantum meruit* for services rendered, to prevent unjust enrichment of the seller at the broker's expense (*Nardi & Co. v. Allabastro* (1974), 20 Ill. App. 3d 323, 314 N.E.2d 367), such circumstances are not present here. Plaintiff testified and admitted in discovery that he was to be compensated only on commission, that the commission was to be based only on results produced, and that he did not obtain the buyers Campbell and Gehrs. While plaintiff did testify that Campbell had seen the operating statements he had prepared, Campbell testified he could not remember ever seeing the statements. Furthermore, plaintiff's witness Schimke testified that there was no substantial difference between the statements prepared by plaintiff and those prepared before plaintiff was hired. We have examined the statements introduced into evidence and we cannot discern any significant difference.

Similarly, plaintiff's contention that his dealings with Schlesinger benefited the seller because the negotiations were communicated to Campbell was not proved. The only evidence of such a communication was plaintiff's testimony that he interrupted a conversation between Pristo and Campbell and told Pristo he did not feel it was right for Pristo to be using Schlesinger to increase the offer from Campbell. This is only evidence of plaintiff's accusation, not evidence that the information was communicated. While plaintiff called Campbell as a witness, he did not ask Campbell any questions about Schlesinger or his knowledge of other offers during his negotiations. We thus find no evidence to support

plaintiff's claim on this theory, since plaintiff neither procured the purchaser nor served as a catalyst for the transaction. *Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 738, 365 N.E.2d 724, 728.

For all of the above reasons, we conclude that there was a lack of proof of essential elements of plaintiff's case and the judgment must therefore be reversed. We need not discuss the other arguments advanced by defendants.

Judgment reversed.

GOLDBERG, P. J., and McGLOON, J., concur.